NORTHEAST OHIO EMERGENCY AFFILIATES, Appellee,

v.

OHIO STATE MEDICAL BOARD, Appellant.

[Cite as *Northeast Ohio Emergency Affiliates v. Ohio State Med. Bd.* (1994), 93 Ohio App.3d 1.]

Court of Appeals of Ohio,
Franklin County.

No. 93AP–823.

Decided Feb. 3, 1994.

2

---

*Emens, Kegler, Brown, Hill & Ritter, Donald A. Antrim* and *Noreen S. Wolff,* and *Susan H. Lefferts,* for appellee.

*Lee Fisher,* Attorney General, and *Anne C. Berry,* Assistant Attorney General, for appellant.

PETREE, Judge.

Appellant, the State Medical Board of Ohio, appeals from a judgment of the Franklin County Common Pleas Court, which reversed the board's determination that the physician's assistant utilization request formulated by appellee, Northeast Ohio Emergency Affiliates ("NOEA"), did not comply with R.C. 4730.02(A). In this regard, the board asserts two assignments of error, as follows:

"I. The common pleas court erred in holding that, as a matter of law, physicians who contract with a hospital to render services as house physicians may employ physician's assistants pursuant to R.C. Chapter 4730.

"a. The court incorrectly ruled that the hospital patients who would receive the services of physician's assistants would be the patients of the house physicians who would employ the physicians' assistants as required by R.C. 4730.02(A).

"b. Even if the establishment of a physician-patient relationship were enough to render the hospital patients the 'patients of the employing physician' for the purposes of R.C. 4730.02(A), the court erred in finding that a physician-patient relationship would exist between the hospital patient and the house physician.

"II. The common pleas court abused its discretion in failing to give due deference to the State Medical Board's interpretation of the technical requirements of R.C. 4730.02."

These assignments of error present one issue for our review. That issue is whether the common pleas court's construction of R.C. 4730.02(A) amounted to an abuse of discretion. Because we must conclude that the court was correct in reading R.C. 4730.02(A) to permit a house physician in a hospital to employ a physician's assistant just as any other physician could, we cannot conclude that the court abused its discretion. We therefore affirm the judgment below.

NOEA, which is a group of physicians practicing in Euclid, Ohio, submitted a physician's assistant utilization request under R.C. 4730.02(C) to the medical board for approval of a plan to use such assistants in conjunction with NOEA's house physicians at Euclid Meridia Hospital. The board voted to deny the request and notified NOEA, who requested a hearing under R.C. Chapter 119. A hearing was held before a hearing examiner on February 6, 1992, who recommended that NOEA's request be approved. Instead of adopting that recommendation, however, the board remanded the matter to another hearing examiner. That hearing examiner then conducted another hearing and recommended that the request be denied. This examiner reasoned that physician's assistants could not work on patients of an admitting physician because, by statute, assistants are limited to working on patients of the physician who employed them. The board accepted this reasoning and denied NOEA's request once again.

NOEA then appealed to the common pleas court pursuant to R.C. 119.12. The court reversed the board's order, reasoning that the hospital patients were in fact patients of the house physician because a physician-patient relationship existed between them. Thus, since such a relationship existed for those patients, physician's assistants could be utilized under R.C. 4730.02(A).

The board consequently appealed the order of the common pleas court to this court on this question of law. The following evidence was adduced before the medical board hearing examiners.

NOEA's first witness was its president, Dr. Kenneth A. Weiner, who authored the physician's assistant proposal in question. He testified that NOEA presently has contracts with Euclid Meridia Hospital to provide both emergency room and house physician services. The house physician service, which despite the name of the professional corporation is not performed in the emergency room itself, is available to admitting physicians who expressly request it either upon patient admission or later during the hospitalization. Currently, the house physician is utilized for emergency care. That is, if there is a change in the status of the patient that would be of concern to the admitting physician, or if the admitting physician cannot see the patient when care is needed, then the house physician will intervene. Hence, upon request of the admitting physician, the house physician will provide care as appropriate and relay the state of the situation back to the admitting physician.

Dr. Weiner said NOEA's proposal for physician's assistants would utilize the assistant as merely an extension of the house physician, who essentially delegates certain tasks to the assistant to be performed under either direct or subsequent supervision by a qualified physician. The house physician would therefore check the assistant's work to see that it was done properly, would be responsible for completion of any procedure, and would countersign any chart entries. NOEA would employ only two assistants per one house physician at a time. And, a house physician would be on call twenty-four hours per day.

Dr. Weiner testified that the house physician acts as a consultant to the admitting physician. To order these consulting services, the admitting physician would check off what was desired on an NOEA form. If the admitting physician does not request the service, then none would be provided except in cardiac arrest situations. In that event, any doctor on a floor would be called on to help save a life. Otherwise, if there is no request, then no physician's assistant would come in contact with the hospital patient.

However, if there is a request for house physician services, NOEA's procedure would be to have the house physician first see the patient to establish the physician-patient relationship. Then, the physician's assistant would perform routine history and physical examinations. Dr. Weiner said the assistant would

not be working with the admitting physician. In essence, then, the admitting physician has delegated the history and physical examination duties as part of the patient's care to the house physician, who then delegates those tasks to his physician's assistant.

Dr. Weiner noted that NOEA's application listed the proposed procedures that were to be performed by the physician's assistant. These included collection of specimens for blood counts, urinalysis, stool analysis and cultures, using office kits. Moreover, the assistant could also perform venipuncture, care for minor lacerations and sutures, apply bandages, administer intravenous fluids on the order of the physician, remove foreign bodies under direction of the physician, perform cardiopulmonary resuscitation, carry out aseptic and isolation techniques, perform catheterization and provide patient education regarding common medical problems. The history and physical examination to be administered by the assistant would include taking blood pressure, vital signs, pulse, rectal examinations, osculating the heart and listening for breath signs. The information would then be put on the chart for the house physician, who would sign off on the assistant's work and then relay it to the admitting physician.

Dr. Weiner elaborated that the house physician is really a specialist in the area of acute care management. NOEA's physicians are trained in internal medicine and have special training and experience in handling critical care situations. Hence, unlike some admitting physicians, they are routinely capable of introducing ventricle lines, intubation and other emergency procedures. The house physician can also be utilized as a source of a second opinion on a patient's care. As such, they would not have authority, other than in emergency situations, to give orders for patient care and management independent of, or without approval of, the admitting physician. Simply put, they do not take over the ongoing care and management of the patient.

NOEA's second witness was Gail Kovacs, vice president of professional services at Euclid Meridia Hospital. Her primary responsibilities include medical and surgical staff affairs and professional support departments. She said the hospital's bylaws expressly provide that the admitting or attending physician may designate a consulting physician to care for their patient. She said that the house physicians in question qualify as consulting staff under those bylaws and as such do not have admitting privileges. She said the house physician does not take over the care of the admitting physician's patient but only provides backup care in the event of an emergency.

As this court noted in *Barry v. State Med. Bd.* (Aug. 30, 1990), Franklin App. No. 89AP–689, unreported, 1990 WL 126292, in reviewing an order of the medical board under R.C. 119.12, the common pleas court determines if that order is supported by reliable, probative and substantial evidence in accordance

with law. In contrast, in reviewing the decision of the common pleas court on further appeal, the appellate court determines if the common pleas court abused its discretion.

R.C. Chapter 4730 regulates the licensing and practice of physician's assistants in Ohio. R.C. 4730.02 provides in pertinent part:

"(A) The physician's assistant shall function under the supervision and control of a physician or physicians. Supervision requires the availability of a physician for consultation and direction of the actions of the assistant, but does not necessarily require the personal presence of the supervising physician at the place where services are rendered. The physician's assistant may provide services only to patients of the employing physician or physicians. He may function in any setting within which the employing physician or physicians routinely practice * * *.

"(B) The physician's assistant must be employed by the physician or physicians to whom his certificate of registration is issued under section 4730.04 of the Revised Code.

" * * *

"(E) The employing physician or physicians assume legal liability for the services provided by the assistant.

"(F) When the assistant ceases to be employed by the physician or physicians to whom his certificate of registration is issued, his registration is immediately suspended. The physician or physicians shall within two week days after the cessation of employment of the assistant, inform the board of this occurrence and if the employment was terminated by or at the request of the physician or physicians, the reason for this action will be given. The physician or physicians are not liable for any services provided by the assistant after his employment is terminated, if such services are rendered after his termination."

R.C. 4730.01(A) defines "physician's assistant" as "a skilled person qualified by academic and clinical training to provide services to patients under the supervision and direction of a licensed physician or group of physicians who are responsible for his performance." R.C. 4730.01(B) defines "physician" as "a doctor of medicine, doctor of osteopathic medicine or surgery, or doctor of podiatric medicine who holds a current, valid certificate of licensure to practice medicine or surgery, osteopathic medicine and surgery, or podiatry under Chapter 4731. of the Revised Code." Before addressing the parties' arguments concerning the interpretation of this statute, we must note that the issues in this case do not concern the wisdom of allowing physician's assistants in Ohio. The General Assembly, in its wisdom, decided in 1974 to enact R.C. 4730.02(A) and thereby permit these individuals to assist medical practitioners. Hence, though

some board members expressed their distaste in the board's minutes for the use of such assistants, R.C. Chapter 4730 is the law of Ohio and we are bound to follow it. We should not artificially restrict the use of these individuals through a strained construction of the statute because of our own feeling that physicians should or should not be performing histories and physical examinations.

■ Of course, in reviewing a medical board order courts should accord due deference to the board's interpretation of the technical and ethical requirements of its profession. *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 614 N.E.2d 748, syllabus. However, as the parties' arguments reflect, the issues in this case involve statutory construction and legal principles, not the fine points of internal or emergency medicine. More particularly, the arguments concern whether a physician-patient relationship existed and which doctor would be liable for malpractice under alternative interpretations of R.C. 4730.02(A). These are questions historically developed and resolved at common law, which are entirely suitable for this court to decide when enforcing the intent of the General Assembly as embodied in R.C. 4730.02. It is to those issues that we now turn.

■ The word "employing" in R.C. 4730.02(A) is not defined in the statute and is ambiguous because either it can mean giving someone a job or it can mean utilizing. We think the former is the appropriate construction here because R.C. 4730.02(B) provides that "[t]he physician's assistant must be employed by the physician or physicians to whom his certificate of registration is issued under section 4730.04 of the Revised Code." The "employing" physician, then, is the one who hires the assistant to work on that physician's patients. That physician actually holds the assistant's certificate, with both the names of the assistant and that physician on it, until the employment of the assistant is terminated. If a termination occurs then, under R.C. 4730.02(F), the assistant's registration is immediately suspended and the assistant can no longer practice until the assistant can get another job with another doctor who will certify the assistant.

■ Hence, the statutes are written to allow physician's assistants to work only for the particular doctor who "employed" the assistant by registration and certification. As a consequence, assistants in Ohio cannot practice independently of such employment with the certifying physician and should never be free to work without the corresponding supervision, control and vicarious liability that goes along with the certification. In this sense, then, it is quite obvious that NOEA was the group of "employing" physicians for whom the assistant was to work in this case. This is so because NOEA sought to certify and register the proposed assistants.

■ The next and pivotal question under the statute is whether the hospital patients that were to be serviced by NOEA house physicians were "patients of"

those employing physicians, since those are the only types of patients that a physician's assistant can service. Again, the term "patients of" is not defined in the statute.

The common pleas court defined the term by resorting to the common law, reasoning that one becomes a patient when a consensual physician-patient relationship is created. The court found such a relationship between the house physician and the admitted patient.

The board, by contrast, wants this court to use what it views as a medical malpractice definition in this case. The board views the admitted patient in the hospital as the "patient of" the admitting physician—the doctor who brought that person to the hospital and is primarily in charge of the general overall care of that person. Simply put, the board insists that the house physician cannot really call the admitted patient "his patient" because the house physician is ultimately not responsible for that patient.

The board's reasoning is fundamentally flawed. As the trial court noted, the physician-patient relationship is established by an express or implied contract to provide medical services. *Tracy v. Merrell Dow Pharmaceuticals* (1991), 58 Ohio St.3d 147, 150, 569 N.E.2d 875, 878–879; *Amer v. Akron City Hosp.* (1976), 47 Ohio St.2d 85, 1 O.O.3d 51, 351 N.E.2d 479. Here, the house physician meets with the patient and establishes the relationship just as any other physician would.[1] Along with that relationship, of course, goes potential malpractice liability, despite the board's erroneous interpretation of the case law on the subject.

In this regard, the board reads this court's decision in *Martin v. Children's Hosp.* (Apr. 29, 1980), Franklin App. No. 79AP–806, unreported, as standing for the principle that a hospital physician's sole duty to an admitted patient is to follow the orders of an admitting physician. However, *Martin's* holding that a young hospital resident could not be liable for medical malpractice in failing to

---

1. The dissent argues that NOEA's physician's assistant utilization was deficient because it did not adequately spell out that the hospitalized patient must be seen by the house physician prior to the rendition of services by the assistant. However, that was not the reason the board gave for denying the request here. The board's hearing examiner denied the NOEA's request because the house physicians were not given a full delegation of primary care responsibility by the admitting physician under the plan. This legal standard was adopted and applied by the board and presents the sole issue in this appeal.

   At any rate, it is obvious that the house physician must see the patient first, unless it would endanger the patient's chance of survival due to a life-threatening situation or futile due to the patient being incompetent or unconscious. Indeed, Dr. Weiner expressly testified that the house physician will establish a physician-patient relationship face-to-face with the patient prior to utilizing the assistant. This is undisputed. The dissent thus finds the request lacking a procedure so obviously necessary in all circumstances that it did not have to be spelled out in the request.

countermand the negligent order of the attending physician must be read in light of *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 553 N.E.2d 1038, which expressly recognized in paragraph five of the syllabus that a hospital physician could be liable for failing to keep the attending physician fully informed of a patient's condition. Hence, even if the hospital physician is not the physician "in charge," the hospital physician still does bear responsibility for the well-being of his patient and could be held liable for his or her own malpractice on that patient.

The board cannot cite any authority for the proposition that a house physician, acting within the scope of his authority for patient care, could not be liable for medical malpractice on his patient. We therefore decline to accept the board's proffered construction of R.C. 4730.02. It cannot be concluded that the house physician would be immune from suit just because the admitting physician grants the house physician authority to engage only in emergency procedures.

Moreover, given the delegation of authority to the house physician, it cannot be concluded that the assistant is in reality working for the admitting physician. While the hospital physician and the staff should follow the orders of the admitting physician as stated in *Albain*, those orders filter through the judgment and direction of the house physician to the assistant. As expressly reflected by the testimony in the record, the physician's assistant does not work with the admitting physician. On the contrary, as R.C. 4730.02(A) contemplates, the assistant works with and for the "employing physician," and that physician will be strictly liable for that assistant's mistakes under R.C. 4730.02(E).

In the final analysis, the board's proffered construction of R.C. 4730.02(A), which is premised on its own incorrect view of the medical malpractice liability of a house physician, is simply unsound. Obviously the statutory scheme tying the physician's assistant to the certifying physician was enacted to establish careful controls over the practice of physician's assistants. The board's construction, however, would not serve that purpose but instead would artificially limit the utilization of such assistants well beyond what was envisioned by the legislature. It would result in the absurd consequence of allowing such assistants to work for any private physician, but not if that physician takes referrals for consultation. In this day of increasing specialization in the medical profession, the board's proffered construction would serve to eliminate a tremendous amount of work for the physician's assistant, despite the economies and efficiencies that may result from such health care practices, as the legislature recognized.

For the foregoing reasons, we find that the trial court did not abuse its discretion in reversing the board's order. Accordingly, appellant's assignments of error are overruled and the judgment is affirmed.

*Judgment affirmed.*

HARSHA, J., concurs.

JOHN C. YOUNG, J., dissents.

WILLIAM H. HARSHA III, J., of the Fourth Appellate District, sitting by assignment.

JOHN C. YOUNG, Judge, dissenting.

Inasmuch as I am unable to concur in the majority opinion, I must respectfully dissent. The majority concludes that R.C. 4730.02(A) permits a house physician in this situation to employ a physician's assistant as any other physician could employ a physician's assistant. Specifically, the majority found that the procedure as outlined by Northeast Ohio Emergency Affiliates ("NOEA") was sufficient to ensure that a physician-patient relationship was created between the house physician and the admitted patient. I disagree.

As the majority concluded, by checking the appropriate box on a form, the admitting physician requests that the house physician perform certain tasks with regard to the patient of the admitting physician. The house physician then delegates certain of those responsibilities to the physician's assistant employed by the house physician. According to NOEA's procedures, the house physician should first see the patient in order to establish the physician-patient relationship, then the physician's assistant would perform certain routine tasks. However, there simply is no requirement within the outlined procedures that the house physician actually see the patient before any tasks are performed by the physician's assistant and there is no procedure whereby the patient manifests his or her intent to establish a physician-patient relationship with the house physician. Without the manifestation of that intent, without some affirmative action on the part of the patient, I cannot concur with the majority opinion that a physician-patient relationship has been established. As such, the patient does not become a patient of the house physician and, therefore, the physician's assistant cannot perform any duties on that particular patient.